TILLIE TOMNITZ, Administratrix of the Estate of MARTIN TOMNITZ, v. THE EMPLOYERS' LIABILITY ASSURANCE CORPORATION, LIMITED, of London England, Appellant.—121 S. W. (2d) 745.

Division One, November 19, 1938.

*James R. Sullivan, Sullivan, Reeder & Finley, Jones, Hocker, Glad-
ney & Grand* and *James C. Jones, Jr.*, for appellant.

*Everett Hullverson, J. Edward Gragg* and *Robert L. Aronson* for respondent. .

BRADLEY, C.—This cause, a garnishment proceeding, has been reassigned. April 5, 1933, Martin Tomnitz obtained a judgment against Pioneer Silica Products Company in the sum of $15,000 for personal injury, caused by the disease of silicosis. Tomnitz died June 10, 1933, and the cause was revived in the name of his administratrix, Tillie Tomnitz, his widow. Execution against the judgment defendant was returned *nulla bona,* and on August 4, 1934, the administratrix commenced garnishment proceedings against the Employers' Liability Assurance Corporation, The Underwriting Members of Lloyds, and T. H. Mastin & Company, attorneys in fact for The Subscribers at Consolidated Underwriters. The garnishment is on the theory that the liability policies of the three named garnishees issued to the Pioneer Silica Products Company covered the injury Tomnitz received. A jury trial resulted in a finding that, at the time of the service of the garnishment writs, the garnishees were indebted to the Pioneer Silica Products Company as follows: The Employers' Liability Assurance Corporation, $10,000; The Underwriting Members of Lloyds, $15,000; and T. H. Mastin & Company, $5000. The jury's verdict limited total recovery of garnisher to $15,000 with interest at six per cent from April 5, 1933, which amounted to $1897.50. The verdict also included costs in the sum of $153.15, which had accrued in the Tomnitz case, and for which garnisher was liable. Including interest and cost garnisher's recovery was limited to $17,050.65.

On the day the verdict was returned the court ordered that the garnishees, within 10 days, pay into the registry of the court the $17,050.65. Motions for new trial were duly filed. The garnishees failed to pay into the registry as ordered, and on June 4, 1935, the court entered formal judgment against the garnishees for $17,050.65, but the judgment liability against each garnishee was limited in the judgment as in the verdict of the jury. Motion for new trial by T. H. Mastin & Company was sustained. The motions of the other two garnishees were overruled, and The Employers' Liability Assurance Corporation alone appealed.

Hereinafter we refer to the parties to this appeal as garnisher and garnishee, and refer to the Pioneer Silica Products Company as the judgment defendant.

The pertinent provisions of the policy issued by garnishee to the judgment defendant are:

"The Employers' Liability Assurance Corporation, Limited, of London, England (hereinafter called the corporation), hereby agrees with the assured named in the declaration attached hereto, and made

a part hereof, as respects *bodily injuries*, including death at any time resulting therefrom, covered by this policy and *accidentally sustained* by any person or persons employed by the assured, as follows:

"Agreement I. (a) To settle or to defend in the manner hereinafter set forth against claims resulting from the liability imposed upon the assured by law for damages on account of *such injuries.*

. . .

"Agreement VI. This policy covers only such injuries so sustained by reason of *accidents* occurring within the policy period." (Italics ours.)

Garnishee in effect makes three assignments, viz.: (1) That silicosis resulting from the inhalation of silica dust over a long period of time is an *occupational disease* and not a *bodily injury, accidentally sustained* within the meaning of these terms in the policy; (2) that even though the disease of silicosis with which Tomnitz was afflicted was a bodily injury, accidentally sustained within the meaning of the policy, still garnishee is not liable, because, it is claimed, such injury was not *sustained* during the policy period; and (3) that the court erred in giving garnisher's Instruction No. 1 based on the theory of estoppel.

Tomnitz worked in the judgment defendant's silica plant at Pacific, Missouri, during 1925, 1926, and 1927, and that he acquired silicosis while working in the plant was finally adjudged in the Tomnitz case against the judgment defendant, and that judgment, as to *where* he acquired the disease, is binding, as to that question, on garnisher and garnishee. [Soukup v. Employers' Liability Assur. Corp., 341 Mo. 614, 108 S. W. (2d) 86, 112 A. L. R. 149.] The period covered by the policy here concerned, ran from October 8, 1924, to October 8, 1926. Two policies, each for one year, were issued to the judgment defendant by the garnishee, but we refer to these as the policy. Our Workmen's Compensation Act was adopted, at a referendum election November 2, 1926 (see Laws 1927, p. 490), and was not in force during any part of the policy period.

The disease of silicosis is certainly a *bodily* injury, hence we direct our attention to the term *accidentally* sustained. The Soukup case, supra, was a garnishment proceeding to collect a judgment for $15,000. The judgment was in favor of the plaintiff in Soukup v. Ford. Soukup was an employee of Ford from May 15, 1930, to December 30, 1931, and in the work of his employment he contracted the disease of lead poisoning from which he suffered partial paralysis. It was alleged that the disease was contracted on account of the negligence of Ford in failing to observe statutory requirements "to furnish specified contrivances and a reasonably safe and healthful establishment or place" for Soukup to work. (The allegations of the Tomnitz petition against the judgment defendant were similar to those in the case of Soukup v. Ford.) Ford had liability insur-

ance and the insurer was garnished. The policy contained 7 clauses that were involved. One (a) agreed "to pay promptly to any person entitled thereto under the Workmen's Compensation Law and in the manner therein provided." One (b) indemnified Ford "against loss by reason of the liability imposed upon him by law for damages on account of such injuries to such of said employees as are legally employed; . . ." clause two related to inspection; three and four related to the defense of suits and costs; five related to employees covered; six limited coverage to injuries sustained by business operations, etc.

The seventh was: "This agreement shall apply only to such injuries so sustained by reason of *accidents* occurring during the policy period." (Italics ours.)

The defense in the Soukup garnishment case was that the injury (lead poisoning) was not the result of an *accident* within the meaning of that term in the policy, and was not therefore covered by the policy. It was held that, in view of the language of clauses one (a) and one (b), there was an ambiguity presented and upon constructions of the whole policy the judgment for the garnisher, Soukup, was affirmed.

In the course of the opinion in the Soukup case the terms *personal injury* and *accident* were considered at some length, and especially the term *accident* as used in the Compensation Law and when not so used. In that case the court said: "Irrefutably we think upon consideration of the policies as a whole, said personal injuries resulting from accident came within clause 1 (a) or clause 1 (b) according as the injuries were, on the one hand, of the particular nature and the product of accident, as those two terms are defined in the Workmen's Compensation Act; or, on the other hand, as the injuries suffered were the result of the employer's negligence and were within the scope and broader definitions of 'accident' and 'personal injuries.' "

And in the Soukup case the court further said: "Clearly, upon this record, said clause 7 is applicable to and restrictive of clause 1 (b) insofar only as it fixes the limits of the policy period, while it is wholly applicable to clause 1 (a)."

It is stated in the American Law Reports Annotation (112 A. L. R. 158), that it is only in the Soukup case "that the specific question whether an occupational disease is an 'accident' within the terms of an employers' liability insurance policy, is discussed; and therein it is held that an occupational disease is an 'accident' within such policies." The American Law Reports statement that "therein it is held that an occupational disease is an 'accident' within such policies" is too broad if applied generally. The ambiguity in the policy involved in the Soukup case was the decisive feature.

Garnishee cites Belleville Enameling & Stamping Company v. U. S. Casualty Co., 266 Ill. App. 586; U. S. Radium Corp. v. Globe Indemnity Co. (N. J.), 178 Atl. 271, affirmed by Court of Err. & App., 182 Atl. 626; and Utica Mut. Ins. Co. v. Hamera, 292 N. Y. Supp. 811. In the Belleville Enameling & Stamping Co. case, and in the Hamera case, it was held that the occupational disease of silicosis could not be construed as an accident. In the U. S. Radium Corporation case it was held that the occupational disease of radium poisoning was not an accident. It was pointed out in the Soukup case that neither of these cases considered the *meaning* of the term *accident*. The author of the opinion in the Hamera case, while holding that the occupational disease of silicosis could not be held to be an accident in a liability policy, said (292 N. Y. Supp. 1. c. 820): "Frankly, however, the question is a close one. It may well be that these very policies were issued, sold, and interpreted in the trade as covering all occupational diseases, and that the true interpretation of them is that they intend to protect against damages for (1) personal injuries sustained by 'accident' as the word is generally used in liability policies. . . ."

In Blanke-Baer Extract & Preserving Co. v. Ocean Accident & Guaranty Corp. (Mo. App.), 96 S. W. (2d) 648, it appears that Florence Shaales was employed by the plaintiff from October, 1926, till March, 1929, to wash olives, and that, while doing this work, water splashed upon her. Also the floor where she worked became flooded at times, and pools of water stood about. In the course of her work she walked through this water. The room where she worked was cold (in winter) and she contracted colds. After leaving this employment it was discovered that she was suffering from tuberculosis of the lungs, which the evidence of her physicians tended "to show resulted from the lowering of her resistance by reason of the colds contracted while working." Both Florence and her mother filed suit against the employer for damages. The employers' insurer denied liability and refused to defend. Florence's case went to judgment for $1500, and the mother's case was settled for $600, which amounts were paid by the employer. The employer then filed suit against the insurer to recover the amount paid, plus costs and attorney fees. A jury trial resulted in a verdict for the insurer. A new trial was granted and the insurer appealed. Three one-year policies were involved over the period of Florence's work. These were issued April 26, 1926; January 9, 1927; and January 9, 1928. Florence was under the age of sixteen when first employed, October 7, 1926, and her employment was then illegal and not covered; but her employment was legal after June 26, 1928, when she became sixteen, and was thereafter covered, as to time, by the policy issued June 9, 1928. The terms of the policies are not set out in detail, but it would ap-

pear that the policies were similar in terms to the policy involved in the Soukup case.

The insurer in the Blanke-Baer case contended that clause 1 (b) insured only "against personal injuries sustained by reason of accident," and that Florence's injury was not caused by an accident. The Court of Appeals (St. Louis) did not discuss the term accident, but said this: "Clause 7, in which the phrase 'sustained by reason of accidents' is indifferently and obscurely introduced, is intended to limit and define the injuries insured with respect to the policy period rather than to characterize the injuries insured. It is obvious that clause 1 (b) is intended to cover such personal injuries to plaintiff's employees, for which plaintiff shall become liable, as are not covered by clause 1 (a)." Certiorari was quashed. [State ex rel. Ocean Accident & Guar. Corp. v. Hostetter et al., 341 Mo. 488, 108 S. W. (2d) 17.]

The policy involved in Chapin v. Ocean Accident & Guar. Corp., 96 Neb. 213, 147 N. W. 465, 52 L. R. A. (N. S.) 227, was an automobile accident indemnity policy. The insured's automobile, driven by his employee struck Lewis who was riding a bicycle. Lewis said he was not hurt, and the insured did not at the time notify the insurer. Nearly a year later Lewis was stricken with paralysis and claimed that his condition was traceable to the collision, and died in about 18 months after the collision "of a disease alleged to have resulted from the fall." The insured, Chapin, was sued, but the insurer denied liability and refused to defend. A judgment was rendered against Chapin, and he brought suit against his insurer and recovered.

In considering the meaning of the term *accident* in the Soukup case, the court quoted (341 Mo. 614, 108 S. W. (2d) 1. c. 91) from the Chapin case as follows: "The word 'accident' is susceptible of and has received many definitions, varying with the connection in which it is used. It is: 'An event that takes place without one's foresight or expectation; an undesigned, sudden, and unexpected event; chance; contingency; often an undesigned and unforeseen occurrence of an afflictive or unfortunate character; casualty; mishap.' (Webster) . . . As used in an indemnity policy such as this, we are of the opinion that the word 'accident' means an undesigned and unforeseen occurrence of an afflictive or unfortunate character, resulting in bodily injury to a person other than the insured."

Webster's New International Dictionary (2 Ed.) in giving synonyms of the word *accident*, gives chance, mishap, mischance, misfortune, disaster, calamity, catastrophe, casualty, and says that the word *accident* "is of more general application," than is the word casualty.

1 Corpus Juris Sec., pages 426-431 defines accident as follows: "The word 'accident' is derived from the Latin verb 'accidere' signifying 'fall upon, befall, happen, chance.' In an etymological sense

330

anything that happens may be said to be an accident; and in this sense, the word has been defined as a befalling; a change; a happening; an incident; an occurrence or event. In its most commonly accepted meaning, or in its ordinary or popular sense, the word may be defined as meaning a fortuitous circumstance, event, or happening, an event happening without any human agency, or if happening wholly or partly through human agency, an event which under the circumstances is unusual and unexpected by the person to whom it happens; an unusual, fortuitous, unexpected, unforeseen or unlooked for event, happening or occurrence; an unusual or unexpected result attending the operation or performance of a usual or necessary act or event; chance or contingency; fortune; mishap; some sudden and unexpected event taking place without expectation, upon the instant, rather than something which continues, progresses or develops; something happening by chance; something unforeseen, unexpected, unusual, extraordinary or phenomenal, taking place not according to the usual course of things or events, out of the range of ordinary calculations; that which exists or occurs abnormally, an uncommon occurrence. The word may be employed as denoting a calamity, casualty, catastrophe, disaster, an undesirable or unfortunate happening; any unexpected personal injury resulting from any unlooked for mishap or occurrence; any unpleasant or unfortunate occurrence, that causes injury, loss, suffering or death; some untoward occurrence aside from the usual course of events."

█ Aside from definitions of the term *accident*, a situation exists here which seems to show how the garnishee itself construed the terms *bodily injuries, accidentally sustained* as used in the policy. Garnisher invoked this situation in her Instruction No. 1, but called it estoppel. June 5, 1925, garnishee wrote the judgment defendant as follows:

"An inspection was made of your plant for the purpose of determining as far as possible physical conditions that endanger the safety of your employees and which sooner or later may be the cause of *accidents* if not corrected, and in this connection we submit the following:

"1. Driving gears on sand conveyor should be guarded.

"2. Platform around separator should have a standard hand rail.

"3. *Men handling pulverized sand should be compelled to wear respirators.*

"We have no doubt that you will give these recommendations your prompt and careful attention, but as a matter of records we ask that you advise us as soon as you have complied with same.' (Italics ours.)

June 17, 1925, the judgment defendant replied: "Replying to yours of the 15, we are taking up the suggestions made with our plant at Pacific, and will advise you when they have been complied

with." And on June 25, 1925, the judgment defendant wrote garnishee: "In reference to your letter of June 15, your recommendations regarding safety precautions have been complied with."

Harry M. Rogers made the inspection for garnishee. As a witness for garnisher Rogers testified that he "supposed" that the inspection was made "with reference to the advisability of" the garnishee "continuing the insurance on the plant." This supposition was stricken; but it was shown by Rogers' deposition taken shortly before the garnishment trial that he made the inspection for the purpose of determining "the advisability of continuing" the insurance. And Rogers testified at the trial that it was up to him whether or not the insurance was to continue in effect. On the stand Rogers was asked: "Now, Mr. Witness, if you made a recommendation with respect to furnishing respirators to the men working there by reason of breathing this dust or fog, as you have described it, and that recommendation was not carried out, the insurance would be cancelled, would it not?" The answer was: "I could make recommendations, but I couldn't tell whether they were going to stay on it."

In the deposition Rogers testified: "Now, if you made such a recommendation with respect to furnishing respirators to the men working there by reason of breathing this sand, fog, and dust, and were not carried out the insurance would be cancelled, would it? A. Yes."

It will be noted that in garnishee's letter of June 15th, the judgment defendant was informed that an inspection of the silica plant had been made for the purpose of determining, as far as possible, physical conditions "that endanger the safety of your employees and which *sooner* or *later* may be the cause of *accidents* if not corrected and in this connection we submit the following: . . . Men handling pulverized sand should be compelled to wear respirators."

Throughout garnishee's brief it is contended with emphasis that the acquiring of an occupational disease is the very antithesis of an accident. If the terms *bodily injuries, accidentally* sustained, as used in the policy at bar, as construed by garnishee, did not cover the disease of silicosis, then why was it suggested by garnishee that the employees of the judgment defendant "be compelled to wear respirators?" No one will dispute that the wearing of respirators by one working in a fog of silica dust will tend to prevent the acquiring of the disease of silicosis. Garnishee did not in the letter *exclude* occupational diseases, from the *accidents* "which sooner or later may happen." After these suggestions were made by the garnishee and complied with by the judgment defendant, would not the judgment defendant have good reason to believe that the insurance covered such injury as Tomnitz sustained? It seems reasonable that such would be the case. "It is a well established rule of law that the construction placed upon a contract by the parties as evidenced by

acts, conduct, or declarations indicating a mutual intent and understanding will be adopted by the courts where the language of the contract is ambiguous, or there is a reasonable doubt as to its meaning, but not where it is plain and unambiguous." [Scotten v. Met. Life Ins. Co., 336 Mo. 724, 81 S. W. (2d) 313, l. c. 315, and cases there cited.]

In Peters v. Fleming, London '& Lancashire Indemnity Co., Garnishee, 329 Mo. 870, 46 S. W. (2d) 581, it appears that Peters, an employee of Fleming, got a judgment against his employer for $15,000 on account of personal injuries sustained while working on his employer's building. The insurance company was garnished, but claimed that the policy did not cover the building where Peters was injured because the policy only covered three story buildings, and garnishee contended that "the evidence conclusively showed the building to be four stories high." Peters contended that his employer and the garnishee "treated the contract (policy) as covering the building" in question, and there was evidence to that effect. The judgment in the garnishment case was in favor of Peters, and the garnishee appealed.

For the garnisher, Peters, the court gave this instruction: "The court instructs the jury that it makes no difference whether the building, 4616 Lindell Boulevard, known as 'Carlton Apartment' is now or was, at the time garnisher (plaintiff) was injured, three, four or more stories in height; and in arriving at your verdict you are not to take into consideration the number of stories of said apartment, but you are to disregard the same (if you further find that the garnishee, the Indemnity Company construed and treated said building as a three-story building prior to the injury to plaintiff, Peters)." The part of the instruction in parenthesis was added by the court.

For the garnishee the court gave this instruction: "The court instructs the jury that if you find and believe from the evidence that the building mentioned in the evidence, upon which the plaintiff was working at the time he claims to have been injured, exceeded three stories and basement in height, then the plaintiff is not entitled to recover herein against the garnishee and your verdict should be that the London & Lancashire Indemnity Company of America, garnishee herein, is not indebted to the defendant, Robert Fleming (unless you further find that the garnishee, the London & Lancashire Indemnity Company, by its actions, conduct and collections of premiums construed and treated the building covered by the policy as a three-story building)." The part in parenthesis was added by the court.

The court held that the evidence that Fleming and the garnishee treated the policy as covering the building in question was not "an attempt to create a contract or cause of action," but that such evidence "tended to show interpretation of the policy." The instruc-

tions, the court said "did not submit the question of estoppel, but the question of the parties' treatment of their contract." The judgment for the garnisher, Peters, was affirmed.

It does not definitely appear when the inspection was made by the garnishee, but it does appear that the judgment defendant, on June 5, 1925, was informed by garnishee that the inspection had been made, and it appears that the requirements made by garnishee were complied with by June 25, 1925. Also it appears that *after* the inspection, the requirements, and compliance therewith, garnishee *renewed* the policy, and continued the insurance in force until October 8, 1926.

The policy at bar does not define the terms *bodily injuries, accidentally sustained* or place any limitation thereon. In view of the great variety of meanings of the term *accident,* and in view of the judgment defendant's and of the garnishee's construction or interpretation of the policy, and especially the interpretation of the garnishee, and in view of the failure to define the terms *bodily injuries, accidentally sustained* or to place any limitation thereon, it is reasonable to say that an ambiguity exists as to the meaning of the terms *bodily injuries, accidentally sustained* as used in the present policy, and when such situation exists, the insuring contract will be construed in the most favorable light to the insured. In the present situation, we rule that the occupational disease of silicosis acquired by Tomnitz was a *bodily injury, accidentally sustained* within the meaning of these terms in the policy.

Was Tomnitz's injury *sustained* during the policy period? From the transcript of his evidence in his case against the judgment defendant, a portion of which transcript was introduced in this garnishment proceeding, it appears, as stated, supra, that he was employed in the judgment defendant's silica plant during 1925, 1926, and 1927. The policy period was from October 8, 1924, to October 8, 1926. It is conceded that the disease of silicosis was not discoverable in Tomnitz on October 8, 1926, the end of the policy period.

The effect of the ruling in Blanke-Baer Extract & Preserving Co. case, 96 S. W. (2d) 648, cited, supra, was that the injured employee *acquired* tuberculosis or *sustained* the injury during the policy period, although it was shown that for a portion of that period the employee was not covered by the policy because her employment while under the age of sixteen was illegal.

Garnishee calls our attention to De Filippo's case, 284 Mass. 531, 188 N. E. 245, and quotes therefrom this: "In cases of personal injury through the gradual accumulation in the body of harmful foreign matter, it has been held that a 'personal injury' occurs when the accumulation becomes so great as to cause incapacity for work, and not before." Massachusett cases are cited in support, but the De Filippo case and all those cited are compensation cases. In that case

it was found by the Industrial Accident Board that the employee, in the course of his employment as a stonecutter, "received an injury, arising out of his employment, through the continual inhalation of particles of stone dust, which resulted in the condition called pneumoconiosis, popularly called stonecutters' disease," and that such was a personal injury within the Massachusetts Compensation Law. What was said in that case as to *when* the injury occurred was in connection with the subject of compensation, and in this connection the court said that "generally speaking, compensation is allowed only for impairment of earning capacity."

Garnishee also calls our attention to Rossi v. Thomas F. Jackson Co., 117 Conn. 603, 169 Atl. 617, a compensation case. In that case it is said that "pneumoconiosis is an 'injury' which arises and becomes compensable when the diseased condition yields to the infection and unfits the employee for work."

Garnisher introduced expert evidence as to the disease of silicosis, and it seems that counsel was endeavoring to show that Tomnitz acquired silicosis by *accident*. The question as to whether the disease of silicosis acquired by Tomnitz was *accidentally sustained* within the meaning of this term as used in the policy, was a question of law, and the question as to whether he *acquired* the disease during the policy period was a question of fact.

"It is the exclusive province of the court to construe a written instrument. If words of doubtful meaning are employed, or such as have more than one meaning, the question whether their technical sense is different from their ordinary meaning, may be left to a jury; but, in the end, the court must determine the interpretation of the contract with such light as the verdict may afford on the question submitted to the jury." [Edwards v. Smith, Admr., 63 Mo. 119, 1. c. 127; Cowell v. Employers' Indemnity Corp., 326 Mo. 1103, 34 S. W. (2d) 705, 1. c. 710.] In the present case there was no evidence throwing any light on the question of construction except as to the inspection made by Rogers and the letters introduced, and this evidence was not disputed. "Where the evidence" as to the interpretation of a contract "is undisputed there is nothing to submit to the jury." [McFarland v. Gillioz, 327 Mo. 690, 37 S. W. (2d) 911, 1. c. 916, and cases there cited.]

The situation here is unlike that obtained in Bieser v. Goran, 340 Mo. 354, 100 S. W. (2d) 897. In that case the employee failed to establish that he acquired the disease of silicosis during the period of his employment, while here there is no such question, because as appears, supra, that question was settled as to garnisher and garnishee by the Tomnitz judgment against the judgment defendant.

Garnisher introduced evidence showing that Tomnitz worked at the silica plant, and *when* he worked, and the dust conditions, but there is no evidence as to *when*, in the policy period, he *acquired*

silicosis. Garnisher used as witnesses, Drs. J. S. Young, Erich Thurston and L. S. Luton. Dr. Young was an X-ray specialist, and had made a special study "of dust diseases of the lungs" over a period of 11 or 12 years. He examined Tomnitz, but does not say when. He testified:

"Q. Now, doctor, in the breathing of silica dust into the human lungs, what is the effect of it upon the lungs and when does the effect begin? A. Well, you are speaking now of silica dust? Q. Silica dust; yes. A. Well, where you take silica dust, its injury begins when it is first inhaled. The larger particles inhaled, naturally, to a certain extent, affect the upper respiratory tract, namely, the nose and the upper portion of the trachea, but those are not the particles that do the actual damage and that produce silicosis. It is the finer particles that are carried into the deeper portions of the lungs, namely the bronchials and the alveoli, that finally produce the scar tissue from their inhalation. Q. Now, the first injury which you say occurs immediately upon breathing the dust—that first injury—is that in itself sufficient to cause an occupational disease known as silicosis? A. No. Q. It requires repeated injuries; is that correct? A. Yes; sure, indeed. Q. Now, doctor, is the length of time that these repeated injuries occur caused by the breathing of dust into the lungs, is that time known, and is it always the same? A. No; there are several factors that enter into it; the amount of dust inhaled, the character of work the patient is doing; for instance, if he is doing hard, manual labor and he takes deep inhalations, he naturally takes a greater amount of dust into the lungs with each inhalation than he would if he were sitting writing or bookkeeping, or something of that kind. Q. You say it produces a scarred tissue? A. Yes; that is what we term fibrosis. Q. Is there any germ connected with silicosis? A. Not silicosis *per se*. Q. It isn't? A. No. Q. It is caused from what? A. It is caused from the inhalation of silica."

On cross-examination Dr. Young testified that he had "seen two men working along together, say, for a period of two years; one of them succumbs to silicosis and the other showed absolutely a negative condition—no symptoms. Sometimes one individual will get the condition within a very short period of time—whereas other people get it, it takes years for them to get it, so we have no definite, set, fixed time;" that he thought the government "puts a minimum" of about two years to acquire silicosis; "an average of about two years; that is, the cases that develop under two years, under the ordinary conditions in these silica plants where these men are employed in a dust hazard, is about two years, the minimum, but frequently you find them a shorter time than that;" that the time varied among different individuals; that he had seen "one man that

had thirty-three years (in silica dust) and we did not find anything wrong with him.''

Dr. Thurston testified that injury was the first thing that happened on breathing silica dust into the lungs; but that it would require ''a great many'' inhalations to cause silicosis.

Dr. Luton testified that he examined Tomnitz in November, 1932, and testified at his trial; that he found ''him suffering from chronic fibrosis of the lungs with emphysema; that ''chronic is something that has lasted a long time;'' that ''fibrosis is scarring of the lung;'' and that ''emphysema is the name given to a condition of the lung where the unaffected lung, that is, the lung unaffected with the fibrosis, attempts to overcome this crippled condition, by dilating.''

We have quoted and stated all the evidence in the present record that could even pertain to the point as to *when* Tomnitz acquired silicosis. It is true that the verdict and judgment were in favor of the garnisher, and the *effect* of the finding is that Tomnitz did acquire silicosis during the policy period, but absent evidence tending to show such fact, such finding cannot stand. We do not think that there was any substantial evidence tending to show that Tomnitz acquired silicosis during the policy period.

In view of our rulings, supra, it is not necessary to rule the assignment based on Instruction No. 1. The only question for submission to the jury was whether Tomnitz acquired the disease of silicosis during the policy period from January, 1925, when he commenced to work in the silica plant, to October 8, 1926, the end of the policy period, and that question was not submitted or ruled, except inferentially, as above stated. And as above ruled, there was no substantial evidence tending to show that Tomnitz did acquire the disease of silicosis during the policy period. The judgment should be reversed and the cause remanded to determine that question only, and it is so ordered. *Ferguson* and *Hyde*, CC., concur.

PER CURIAM: The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur, except *Lucas, J.*, not sitting.