**AETNA INS. CO. v. DICKLER et al.**

United States District Court,
S. D. New York.

July 18, 1951.

Bigham, Englar, Jones & Houston, New York City (John M. Aherne, James M. Hughes, Jr., New York City, of counsel), for plaintiff.

Glatzer, Glatzer & Diamond, New York City (Harold Glatzer, New York City, of counsel), for defendants.

CONGER, District Judge.

This suit was tried to the Court without a jury upon two claims for relief.

The first claim seeks judgment declaring the extent of liability under an insurance policy issued by the plaintiff to the defendant Victory Fur Cleaning Company. Alternatively, the claim seeks reformation of the policy.

The second claim is one in the nature of a bill of interpleader and involves all the defendants including coat owners and retail furriers whose garments were in the custody of Victory.

The defendant Victory, a partnership, was in the business of storing and cleaning fur garments owned by others. A burglary occurred at its premises on November 19, 1947 in which customers' goods of the value of $30,000 were taken. Victory maintains that the plaintiff is liable for the entire loss under the terms of the "Customers' Goods Policy" obtained from the plaintiff on May 5, 1947. The plaintiff concedes liability for 50% of the loss and no more.

The pertinent provisions of the policy giving rise to the controversy are as follows:

"It is understood and agreed that the limits of liability under this policy are as follows: * * *

"a. $25,000 in any one loss, disaster or casualty via railway express, warranted 10% of value to be declared to express company.

"b. $7,500 in any one loss, disaster or casualty in custody of messengers or employees of the assured afoot or in private passenger vehicles and/or hand-cart.

"c. $350,000 in any one loss, disaster or casualty while in premises No. 114—16 West 27th Street, New York City.

"d. In the event of loss or damage to the property insured hereunder the same shall be adjusted in accordance with the value shown on receipt issued by the assured or the assured's customer to the owner of said property, including the actual cost of labor incurred and material used by the assured in the process of work performed on same."

"e. "Adjustment and Payment of Premium: It is understood and agreed that this company's liability is 50% of the above limits at rate of $1.25 per $100.00 of gross receipts as invoiced to customers, whereby this company is to receive 50% of monthly declaration and shall be due and payable on the 10th day of each month for the preceding month."

An endorsement on the policy made June 12, 1947 reads: "Notwithstanding anything to the contrary contained in the policy itself, it is understood and agreed that this company shall not be liable in any one loss, disaster or casualty, either in case of partial or total loss, or salvage charges, or any other charges or expenses, or all combined, for more than 50% of the amounts shown in the policy, all other terms and conditions remaining unchanged."

From these provisions Victory reasons that the plaintiff is liable for the entire loss since $30,000 is less than "50% of the * * * limits" of $350,000; while the plaintiff urges that the policy intends liability to extend to 50% of the *loss* only.

A casual reading of the policy might give the impression that Victory is correct in its attitude but upon closer study it may be seen that the policy is susceptible to the plaintiff's interpretation, too.

Included among the "limits" of the policy is "the value shown on receipt issued by the assured or the assured's customer to the owner of said property." A loss is adjusted in accordance with such value.

Therefore, each receipt value represents a limit of liability of which the plaintiff is responsible for only 50%.

Further suggestive of the latter view is the fact that the plaintiff received only 50% of the premium rate of 1% per $100 of receipt values as invoiced.

■ Undoubtedly the policy as written is ambiguous. And it has long been the rule that parol evidence is admissable to aid in the interpretation of a writing susceptible of more than one meaning. This evidence may embrace the circumstances relating to the making of the writing, prior negotiations and agreements, practical construction of the parties and the like. Block v. Columbia Ins. Co., 42 N.Y. 393; Mullen v. Washburn, 224 N.Y. 413, 121 N.E. 59; Fleischman v. Furgueson, 223 N.Y. 235, 119 N.E. 400; Premium Coal Co. v. New Hampshire Fire Ins. Co., 1st Dept., 1942, 265 App.Div. 320, 321, 38 N.Y.S.2d 491; Restatement of Contracts, §§ 237, et seq.

The evidence adduced at the trial makes the true interpretations of this policy clear.

Until he was replaced in March, 1947, one Charles Eisenhauer was insurance broker for Victory. Prior to February 25, 1946, Victory was insured by the National Union Fire Insurance Company with the Universal Insurance Company reinsuring to the extent of 50%. When National Union "got off the line", Eisenhauer offered the entire line as direct insurance to Universal which declined to take more than 50%. Shortly prior to February 25, 1946, Eisenhauer offered the entire line to the plaintiff but the plaintiff's underwriter, Warden, after an inspection, expressed interest in only 50%. Thereafter, the plaintiff signed a binder in which Warden wrote in "50% of the limits shown herein." Universal also signed a binder for 50% interest.

Those policies continued in effect until April 7, 1947, when both were cancelled, presumably because Victory changed its broker. The Aetna policy was rewritten and is identical in all material respects with the first one except as to rate. The Universal policy was not renewed but, to replace it, on May 1, 1947, a policy was obtained from the New Brunswick Fire Insurance Company embodying the same terms as the Aetna policy.

Eisenhauer, Victory's former broker, testified that at the time he obtained the first Aetna policy, it was his understanding that Aetna would be responsible for only 50% of losses whatever they were; that he communicated such understanding to Warden; that he so informed Dickler, one of Victory's partners who took care of this matter. I quote Eisenhauer's testimony:

"Q. Mr. Eisenhauer, after February 25, 1946—that is the date of the Aetna binder —did you have any conversation with Mr. Dickler? A. Yes, sir.

"Q. Where did that take place? A. At his office.

"Q. Did that have to do with the insurance which you had just placed? A. It had to do with the National Union policy being released and also replacing the new insurance. Yes.

"Q. Will you please tell the Court what you said to Mr. Dickler and what Mr. Dickler said to you at that time. A. I told Mr. Dickler that—I think Mr. Desky was present at that time, too—that the National Union was getting off the policy on account of the experience we had, and then they turned around, they are going to replace, and I had it up with the Aetna and another company and each will take a 50 per cent share of the limits.

"Q. Was there anything said about premium at that time? A. No.

"Q. Was there anything said at that time about how much each company would pay in the event of losses? A. Yes, sir. It was explained to them at that time.

"Q. Who explained it? A. I did to Mr. Dickler.

"Q. What did you say to him? A. I told him, being we have two companies on there and each company is carrying 50 per cent of the loss, when making his declarations at the end of the month, he will have to give me the total of the gross receipts, and each company will receive 50 per cent of it and their liability will be 50 per cent of any loss up to the amount that they carried."

Dickler testified that he did not remember such conversation.

Warden testified that it was his understanding that Aetna was to carry only 50% of the risk.

The endorsement of June 12, 1947, was sent to Davidson, Victory's new broker,

along with a letter stating "we are carrying only 50% of the risk in this case." Davidson understood what it meant. It must be noted, however, that the endorsement spoke of "50% of the amounts shown in the policy."

On September 17, 1947, Victory sustained a loss amounting to $11,069.65 and Aetna and New Brunswick each paid 50% of the loss, after claims for such amounts were filed by Victory. Thereafter, New Brunswick cancelled so that the Aetna policy was the only one in effect at the time of the loss in suit.

After the cancellation of the New Brunswick policy, Davidson informed Dickler that he was without full coverage. I quote from Davidson's testimony:

"Q. Did you tell him at that time that he was without full coverage? A. I told him this policy was cancelled prior to the time he even got the notice. I got the first copy of it before he did.

"Q. Will you be good enough to tell me, please if you told him at that time that he was without full coverage and you would have to try to replace that New Brunswick policy? A. Those were not the words, sir. It amounts to the same thing, but it was not the words.

"Q. In substance or effect? A. That is right, sir.

"Q. Then, I will use your own words. Under oath, and prior to this trial, was the following question asked of you and did you make the following answer, referring to that conversation: 'Can you give us the substance of that conversation? A.—

"Q. 'Can you give us the substance of that conversation?' 'A. We found we were without coverage and decided we had to try to get the balance of the coverage that would be required.' A. That would be correct if I said that under oath.

"Q. That question was asked and you made that answer? A. Yes, sir.

"Q. That was true and it is true today? A. That is right, sir."

Dickler could not remember whether he told Davidson to replace the policy although Davidson kept trying right up to the time of the loss. Dickler testified that he did not think he needed the policy to cover him because it was not his busy season, although it appears that such season runs until about November 15th. But whatever the amount of property he had on hand he appears to have had a fair understanding of the meaning of the policy. He testified as follows: "Q. In the event of the loss—we have talked about the disaster, $350,000; we have talked about a $5,000 loss as an example. Now, in the event of the loss of one garment from your premises, the limit of liability of that garment would be the amount stated in your receipt? A. Yes, sir."

Since Dickler knew that Aetna was liable for only 50% of the limits, he must have realized that Aetna was responsible for no more than half of his receipt values.

I believe all the circumstances demonstrate that the parties understood that the plaintiff's liability extends to 50% of the losses only.

The parties have raised a point which deserves some mention. It concerns the general rule that a policy must be strictly construed against the insurance company where an ambiguity exists. Victory seeks the benefit of the rule while the plaintiff seeks to avoid it by showing that the verbiage in the policy is the effort of Eisenhauer, Victory's former broker. Victory asserts that even so, the wording of the June 12th endorsement was Aetna's.

Actually, that general rule is applicable only where the ambiguity persists after all other aids to construction are used. It certainly does not foreclose the use of parol evidence initially to resolve such ambiguity. See Foot v. Aetna Life Insurance Co., 61 N.Y. 571; Arbuckle v. Lumberman's Mut. Casualty Co. of Illinois, 2 Cir., 1942, 129 F.2d 791; 44 C.J.S., Insurance, § 297c, pages 1190 et seq.

The plaintiff has filed a bond in connection with the interpleader in the sum of $29,894.30, which sum equals all the claims computed upon a 100% basis. It is entitled to costs and reasonable attorney's fees out of the fund brought into court. See Globe Indemnity Co. v. Puget Sound Co., 2 Cir., 1946, 154 F.2d 249; Massachu-

setts Mut. Life Ins. Co. v. Morris, 9 Cir., 1932, 61 F.2d 104. Since its liability extends to only 50% of the losses, these sums should be paid out of that portion of the fund representing plaintiff's actual liability.

The allowance for attorneys' fees, however, may not be based on all of the services rendered in this action. The issue first to be decided here was the extent of the liability of plaintiff under the policy. This issue was occasioned by the ambiguity in plaintiff's policy. As to this issue [Count 1], plaintiff was not a stake-holder but an actual and deeply interested litigant. I feel that no counsel fee should be allowed to plaintiff's counsel under this branch of the case. I will defer that matter until the decree is presented.

The plaintiff and Victory have stipulated the amount of loss sustained by each defendant in accordance with the receipts issued and in addition, the reasonable value of the losses sustained by four other defendants to whom no receipts were issued.

Two of these latter defendants were relatives of the assured and services to them were gratuitous. These two are not entitled to recovery here. The other two, however, Mrs. Russel Bubeck and Clara Rogers, I feel should recover. While they had no receipt, still the value of their garments was stipulated and from the evidence [meager, it is true] I believe that they were covered by the insurance policies.

The plaintiff shall settle a judgment in accordance with this opinion and the receipt holders, together with the two other defendants mentioned above, shall share in proportion that their losses bear to the fund representing plaintiff's liability after costs and reasonable attorneys' fees.

The defendants who appeared herein and who entered cross-complaints herein are entitled to judgment against David Dickler and Paul Desky, individually, and as copartners trading under the name and style of Victory Fur Cleaning Company, for any deficiency that there might be between the amount stipulated as the value of the garment by any such defendant and the amount recovered from the plaintiff herein.

Settle decree.